OSCAR THOMASON, plaintiff in error, *vs.* THOMAS N. POUL-
LAIN, defendant in error.

OSCAR THOMASON, plaintiff in error, *vs.* DAVID WILLOUGH-
BY, defendant in error.

1. The lien of a factor for provisions and commercial manures furnished to a planter to enable him to make a crop, as authorized by the act of 1866, is superior, so far as said crop is concerned, to a judgment against the planter dated before the advance of the factor, or even before the act of 1866.

2. When a factor has a lien for supplies, under the act of 1866, upon the growing crop of a planter, made in 1872, and the planter, in the fall and winter succeeding, delivered at the warehouse of A B nineteen bales of cotton, with instructions to sell and apply the proceeds to debts of C and D, and the balance to a lien debt due the factor for 1871, which was so done by the warehousemen, and subsequently the planter delivered to said warehousemen nineteen other bales, both lots being of the crop of 1872, with instructions to sell and apply the proceeds to payment of the factor's lien of 1872:

*Held*, that proof that the warehousemen were the general agents of the factor does not render the transaction, as to the first nineteen bales of cotton, such a fraud upon the judgment creditors of the planter as to postpone the factor's lien upon the second nineteen bales of cotton to judgment liens against the planter.

Factors.   Lien.   Principal and agent.   Payments.   Judgments.   Before Judge BARTLETT.   Greene Superior Court.   March Term, 1874.

One of the judgments was older than 1866, and the court charged that whilst the lien, under the act of 1866, was superior to the other *fi. fas.*, it was not to this. There were thirty-eight bales of cotton made by the defendant that year. He delivered nineteen to the warehousemen, with instructions to sell and pay several debts he owed, among others a debt to the claimant's for advances made the previous year, and this was done. It was in proof that these warehousemen were the claimants' agents in the transaction of his business, though it did not appear that they were his special agents in this transaction.

The court charged that if the warehousemen were the general agents of the claimant, and did with the first nineteen bales, as is stated above, that this, in law, was an act that would estop him from setting up his lien on the second nineteen bales.

With this statement, the above head-notes report the cases.

REESE & REESE, for plaintiff in error.

A. G. & F. C. FOSTER; M. W. LEWIS, for defendants.

McCAY, Judge.

1. The question of the dignity of the liens given by the act of 1866, as compared with judgments, is now for the first time distinctly before us. Is the lien therein provided for superior to judgments in existence at the date of the advance? Such has, without doubt, been the constant ruling of the superior courts since the passage of the act, and the fact that this ruling has been so generally acquiesced in is a strong argument in favor of the rightfulness of such a construction. The act itself is not clear. It does not say, in terms, that the liens provided for shall have any special dignity. The only *words* from which any inference can be drawn—and that is not by any means a strong inference— are the words that say these liens shall be " *enforced* as steamboat liens," which were, in terms, by the act creating them,

stated to be of the *highest dignity.* It is said that this word
"enforce" may fairly mean not only the means but the extent
of the enforcement, as compared with other liens. Perhaps
the strongest argument in favor of the dignity of these liens
is the condition of the country at the time of the passage of
the law, the nature of the liens themselves, and the fact that
any law was passed on the subject. It is well known that
the great object of the legislature was to give facility to ad-
vances to farmers to make the crops ; that the act was passed
just after the war, when the old debts and judgments were
believed to be an incubus that kept down enterprise and
weighed heavily upon industry. Of how little value for
any of the purposes sought for would a lien be that was
subject to be interfered with by a judgment? It may be
said, too, that *all liens of this kind are* made paramount;
the lien of the mechanic, of the builder, of the stone cut-
ter, and of the livery stable man, are all paramount. And
if there be a lien at all for a debt of this nature, to-wit:
for what enters into the thing, goes to make it up and gives
it its value, it would seem it ought to be paramount. The
crop is not in true honesty the property of the maker of it
until the making of it is paid for. As the rent, and the labor,
why not the provisions and manures? There is the very
highest equity in such a lien, since the advance enters directly
into the crop, like the material of the mechanic or the rent
of the landlord : See 40*th Georgia,* 600. It is clear, too, that
the legislature of 1869 understood the lien to be paramount,
since it says of laborers' liens, they shall be superior to all
other liens, except factors', mechanics', or other liens for which
summary remedies are provided, but shall be equal to these
last liens. This language would be nonsense if the liens of
the act of 1866 are not superior to all other liens except those
of like character, to-wit: entering into the crop. For these
reasons we think the liens authorized by the act of 1866 are
superior to judgment liens ; that they stand like mechanic's
liens for labor and material, like the landlord's for rent, the liv-
ery stable keeper for feed of a horse, etc., and this is in terms

made the effect of them by the act of 1872: Code, sec. 1977, par. 5. Nor is there anything in such a view as interferes with the contract of a creditor who had a judgment at the date of the act. True, his lien was on the property of the debtor, present and future. But this law is a provision as to the terms on which he shall acquire property. When the property comes to him, he gets it subject to the law at the time. All these lien laws are based on the equitable idea that the property does not, in fact, fully belong to the debtor until they are discharged, since without them he could not get the property. They stand on the footing of a mortgage for the purchase money given cotemperaneously with a deed to the property. Would it interfere with the contract rights of a judgment creditor if our law makers were to say that the vendor's lien should be reviewed, and that the lien of the vendor should be superior to a previous judgment creditor? We feel sure not.

2. We are not able to see how the conduct of the warehousemen, as to the first nineteen bales of cotton, affected the rights of Mr. Thomason under his lien. In the first place, it does not appear that they were his agents in the transaction. That they were his agents in the transaction of much of his business, does not make out the case. But if they were, we do not think there was anything in the transaction to hurt these parties. The defendant had a right to pay whom he pleased. Thomason did not get the cotton, but only its proceeds, and it was competent for the planter to pay, and him to receive, either debt that was honestly due him. The cotton sold was subject to these *fi. fas.,* and is so yet. Thomason was under no express or implied obligation to take care of the interest of the plaintiffs in the judgments. If they stood still and failed to be diligent, it is not his fault. On the whole, we reverse the judgment, on the ground of the error on this last point, and on the charge as to the judgment being older than 1866.

Judgment reversed.